**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ASHOK ARORA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Honorable Jorge L. Alonso |
| | ) | |
| Diversified Consultants, Inc., | ) | Case No.:  1:20-cv-4113 |
| FMA Alliance Ltd, | ) | |
| First National Collection Bureau, Inc. | ) | Magistrate Judge Jeffrey T. Gilbert |
| T-Mobile USA, Inc., | ) | |
| John Does 1 through 50, | ) | |
| Defendants | ) | |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff Ashok Arora files this FIRST AMENDED COMPLAINT pursuant to Fed. R. Civ. P. 15(a)(1). The amended complaint adds two named defendants, FMA Alliance Ltd ("FMA") and First National Collection Bureau, Inc. ("FNCB"), and new claims.

### JURISDICTION AND VENUE

1.      This court has subject matter jurisdiction under 28 U.S.C. §1331, 28 U.S.C. §1332, 47 U.S.C. § 227 (TCPA), 18 U.S.C. § 1964(c) and supplemental jurisdiction under 28 U.S.C. §1367.

2.      The venue and personal jurisdiction are proper because:

(A)   Plaintiff resides in the Northern District of Illinois,

(B)   Defendant DCI is a foreign corporation that conducts business in the State of Illinois and in this district.

(C)    Defendant FMA is a foreign corporation that conducts business in the State of Illinois and in this district.

(D)    Defendant FNCB is a foreign corporation that conducts business in the State of Illinois and in this district.

(E)    Defendant T-Mobile is a foreign corporation that conducts business in the State of Illinois and in this district.

(F)    The conduct or transactions giving rise to this complaint occurred within the state of Illinois and in this district.

## PARTIES

3.    Plaintiff is an individual who resides in the Northern District of Illinois.

### Diversified Consultants, Inc. (DCI)

4.    Defendant DCI is a FLORIDA corporation with its headquarters located in Jacksonville, Florida.

5.    Defendant DCI is licensed as a collection agency by the State of Illinois with license number 017021502.

6.    Defendant DCI conducts business in the State of Illinois and in this district via telephone and mail.

### FMA Alliance Ltd (FMA)

7.    Defendant FMA is a TEXAS corporation with its headquarters located in Houston, TX.

8.    Defendant FMA is licensed as a collection agency by the State of Illinois with license number 017001406.

9.      Defendant FMA conducts business in the State of Illinois and in this district via telephone and by mail.

## First National Collection Bureau, Inc. (FNCB)

10.      Defendant FNCB is a NEVADA corporation with its headquarters located in Reno, NV.

11.      Defendant FNCB is licensed as a collection agency by the State of Illinois and holds the license number 017021976.

12.      Defendant FNCB conducts business in the State of Illinois and in this district via telephone and by mail.

## T-Mobile USA, Inc.

13.      Defendant T-Mobile is a DELAWARE corporation with its headquarters located in Bellevue, Washington.

14.      Defendant T-Mobile is a nationwide provider of cell phone services and other telecommunication services to consumers and businesses, and operates several retail stores in the State of Illinois and in this district.

15.      T-Mobile is the cell phone service provider for Plaintiff's cell phone service with telephone number ending in 3846.

## John Doe 1

16.      John Doe 1 caller left pre-recorded and artificial voice messages in Plaintiff's 3846 cell phone voicemail during the month of November 2017. The calls were from telephone numbers 206-502-1004 and 414-253-3364. Upon call back, the person would only say he is Mike from in-house processing.

## John Does 2 - 50

17.     John Does 2 through 50 are individuals or entities whose identities are unknown at this time but are expected to be uncovered during discovery, who may be directly or vicariously liable for unlawful conduct of DCI, FMA, FNCB, T-Mobile, and John Doe 1 with respect to Plaintiff.

## FACTS

18.     Plaintiff is a subscriber and user of the cell phone service with telephone number ending in 3846 ("3846 cell phone") since October 2009.

19.     About three (3) months into his new his new cell phone service, Plaintiff began receiving wrong number calls from collection agencies. Plaintiff figured that once he has informed a few callers that they are calling a wrong number, the calls would stop. But the wrong number calls never stopped.

20.     A few weeks after the wrong number calls began, Plaintiff learnt during a call to T-Mobile customer service that there no name on his account. Plaintiff's name had disappeared from his account.

21.     From the pattern and timing of the calls, it became apparent over time that Plaintiff was the intended target of the wrong number calls. For example, the angrier or more annoyed Plaintiff sounded on the phone when answering a wrong number call, the more frequent became such calls.

22.     The callers also appeared to be tracking his cell phone activity which was very unsettling.

23.     The wrong number calls from collection agencies have continued at a furious pace for ten (10) years—averaging over a hundred calls a year—despite Plaintiff informing numerous collection agency callers over the years that they are calling a wrong number.

4

24.     The calls have been absolutely maddening, highly intrusive, and highly disruptive.  To keep his sanity, especially when at work, Plaintiff would frequently switch off his cell phone. But switching off the phone had unwelcome side effects. On more than one occasion, Plaintiff's clients were unable to reach him during an emergency, resulting in souring of business relationship and eventual loss of business.

25.     Majority of the collection agencies asked for Elizabeth Adams, some for Elizabeth G Adams, and a few even mentioned other names.

26.     After receiving over a hundred (100) calls from a collection agency known as Midland Credit Management in a short span of a few months, on August 11, 2014, Plaintiff called a local attorney to seek help stop the calls. All other attempts to stop the calls had failed. During that call, the attorney informed Plaintiff that the caller ID on his telephone shows the name Elizabeth Adams for his 3846 cell phone number. Later that day, Plaintiff met the attorney at his office and took a picture of the caller ID of the attorney's telephone.

27.     The Cook county records show that the very next day, on August 12, 2014, an Elizabeth G Adams agreed to settle a lawsuit brought by Capital One Bank (USA), N.A. and make payments on the debt (Case no. 14 M1 135185). Additional circumstantial evidence that suggests that at least some of the wrong number calls to Plaintiff's 3846 cell phone were regarding this debt. There are other creditor lawsuits as well in Cook county courts against person or persons named Elizabeth Adams.

28.     The attorney Plaintiff had contacted on August 11, 2014 was unable to help him as he dealt mainly with physical injury cases. Plaintiff subsequently visited the offices of Loevy & Loevy—a well known civil rights law firm in Chicago. Plaintiff figured this might be a civil rights issue as the callers appeared to be tracking his cell phone.

5

29.     Shortly thereafter, hell broke loose. Plaintiff found himself frequently being tailed whenever he left home. Plaintiff started receiving what appeared to be checks and bills addressed to different persons at his address. In one egregious incident, paramedics brought what looked like a life-size dummy and said they were bringing her home. That was followed by twice weekly mailing of bills from SUPERIOR AMBULANCE until Plaintiff visited their office and put a stop to those mailings.

30.     There have been numerous attempts over the years to intimidate Plaintiff. The perpetrators appeared to be trying to send a message that they are law enforcement and that he is some sort of a thief—an identity thief or a check thief.

31.     Some of the incidences indicate that members of law enforcement may be involved and this atrocity is possibly being carried out under the color of law. A few years ago, Plaintiff recalls watching a documentary on PBS in which a person described how KGB keeps ringing their phone to harass them and to let them know they are being watched. It appears the local law enforcement may have taken a page out KGB playbook. Only these calls are much more sinister. Documents produced confidentially by a collection agency during discovery indicate to Plaintiff that the wrong number calls were likely part of a corrupt scheme to frame him.

32.     Any doubts Plaintiff had whether he was the intended target of the wring collection calls were dispelled with the events of 2014 and 2015 and continuing intimidation attempts.

33.     Persistent and intrusive wrong number calls from collection agencies over the years have been a source of great mental anguish impacting plaintiff's physical health, emotional health, sense of privacy, sense of security, enjoyment of life, and his ability to work.

34.     There is no legitimate or justifiable reason for the wrong number calls to Plaintiff's 3846 cell phone number. There never was. The calls are the product of a criminal enterprise.

### FACTS Regarding DCI's Calls

35.     During the years 2016 and 2017, plaintiff received several calls on his 3846 cell phone from the following telephone numbers which have been identified as phone numbers used by DCI at the time of the calls: 312-637-8794, 312-637-8795, 312-637-8815, 312-637-8821, 312-637-8834, 312-637-8867, 312-638-3071, and 312-638-3094.

36.     On several of the calls that Plaintiff picked up from above numbers, there was complete silence on the line and the calls were disconnected after a few seconds.

37.     After receiving multiple calls from the above listed numbers, Plaintiff had called each of the number back and the automated voice response identified the called party as Diversified Consultants. Plaintiff did not speak with a live person.

38.     During the month of May 2018, Plaintiff forwarded some of the above numbers to an attorney for a possible legal action. The attorney came back and said the numbers did not belong to DCI.

39.     Subsequently, on September 14, 2018, Plaintiff called the telephone number 800-771-5361 listed on DCI's website as its main contact number.  The person answering the call said the call is being recorded and confirmed that they had indeed called Plaintiff's 3846 phone number. She also stated that they were looking for Elizabeth Adams.

40.     Calls by defendant DCI to Plaintiff's 3846 cell phone number were wrong number calls.

41.     DCI did not have Plaintiff's permission to call his 3846 cell phone number.

42.     During the year 2016 and 2017, DCI had registered its dialing equipment with the Public Utility Commission of Texas ("PUC") as Automatic Dial Announcing Device ("ADAD"). **Exhibit 1 – DCI ADAD Registration**.

### FACTS Regarding FMA's Calls

43.     Plaintiff received several calls from telephone number 800-725-6004 in 2018.

44.     When Plaintiff picked up one of the calls from 800-725-6004, no one came on the line and the call was disconnected after a few seconds—a telltale sign of autodialed call where the automatic dialer has dialed more calls then available agents and no agent is available to take the call.

45.     On April 11, 2018, plaintiff called the number 800-725-6004 back to inquire the identity of the caller and the reason for the calls.

46.     The automated voice response identified the called party as FMA Alliance and the person who answered the call said they were looking for Elizabeth G Adams.

47.     Calls by FMA to Plaintiff's 3846 cell phone number were wrong number calls.

48.     FMA did not have Plaintiff's permission to call his 3846 cell phone number.

49.     During the years 2017 and 2018, FMA had registered its dialing equipment with the PUC of Texas as ADAD. **Exhibit 3 – FMA ADAD Registration**.

### FACTS Regarding FNCB's Calls

50.     On June 22, 2020, Plaintiff received the following text message on his cell phone from telephone number 844-906-2663:

>          "From: First National Collection Bureau, Inc. contacting ELIZABETH G.
>
>          ADAMS. This is an attempt to collect a debt by a debt collector & any

information obtained will be used for that purpose. Contact us @ 1-800-824-6191

or fncbinc.com, use ref# 186539261. Reply STOP to stop SMS."

51.     The text message was addressed to a third party named Elizabeth G Adams.

52.     On July 28, 2010, Plaintiff placed a call to 800-824-6191 and asked whether they had sent a text message to his 3846 cell phone number. The person answering the call said they were looking for Elizabeth Adams.

53.     The text message from defendant FNCB was a wrong number call.

54.     FNCB did not have Plaintiff's permission to call his 3846 cell phone number.

**FACTS Regarding John Doe 1's Calls**

55.     Plaintiff received several calls from telephone numbers 206-502-1004 and 414-253-3364 during the month of November 2017.

56.     On four (4) of those calls, the callers left prerecorded and artificial voice messages for Elizabeth Adams. For example, the caller left the following message on November 1, 2017:

> "This message is intended for Elizabeth Adams. I received a **fax** order regarding a complaint that was filed against you. I have been retained to serve you with documents to appear at your residence or your place of employment. If you have any questions or concerns about this complaint or wish to rectify the matter you can hit any key on your phone to connect to our office directly or call us at the following number 206-502-1004. When calling, please reference file number TZF1592. You have officially been notified."

9

57.     The components of the messages that would vary from one called party to another—the called party name and the file number—were in artificial voice, and the remainder of the message in prerecorded human voice.

58.     The reference to **fax** in the messages was disturbing. Just four (4) days earlier, on October 27, 2017, Plaintiff had filed an appearance with the Judicial Panel for Multidistrict Litigation ("JPML") by **fax** in an attempt to prevent his lawsuit from being transferred to an MDL. This was the first time Plaintiff had filed a document with JPML by fax. The document appeared on the docket on October 30, 2017 (MDL No. 2286 Doc 841, JPML). Calls from 206-502-1004 began the very next day—on November 1, 2017.

59.     Upon call back to phone number 206-502-1004, the person answering the call would identify his organization only as "In-house processing". The same person also answered the call on call back to phone number 414-253-3364.

### FACTS Regarding ADADs

60.     The PUC of Texas defines ADAD as:

> "Any automated equipment used for telephone solicitation or collection that: (A) is capable of storing numbers to be called, or has a random or sequential number generator capable of producing numbers to be called; and (B) alone or in conjunction with other equipment, can convey a prerecorded or synthesized voice message to the number called without the use of a live operator." (**Exhibit 2 – PUC Instructions for ADAD Permit – Definitions)**

61.     The TCPA defines Automatic Telephone Dialing System ("ATDS") as:

"equipment that has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. §227(a)(1).

62.     The issue of ATDS is currently before the Supreme Court in *Facebook v. Duguid* (S. Ct. Dkt. No. 19-511). The debate appears to be centered on whether or not the capacity to generate random or sequential telephone numbers is a necessary condition to qualify as ATDS. Given the definitions of ADAD and ATDS, even under the more restrictive interpretation of ATDS that was adopted by the Seventh circuit in *Gadelhak v. AT&T Servs., Inc.* (7th Cir. 2020), one must conclude that some ADADs may also be ATDS.

**FACTS Regarding T-MOBILE'S Role**

63.     Plaintiff purchased a new cell phone and cell phone service plan from T-Mobile in October 2009. The new phone and service were activated by a T-Mobile store employee.

64.     Plaintiff was assigned the telephone number ending in 3846 by T-Mobile— supposedly randomly from available pool of numbers—and the service was activated in his name.

65.     Plaintiff began receiving wrong number calls from collection agencies the first week of January 2010. A few weeks later, Plaintiff placed a call to T-Mobile customer service to inquire if there was a way he could block the callers. During that call, the T-Mobile customer service representative informed Plaintiff that there was no name on his account.

66.     During the years 2010 through 2015, Plaintiff visited several T-Mobile stores and asked the sales persons or store managers if they had the ability to remove a name from an account. They all said no. They all said they the system does not allow them to do that, and that they have to enter a name.

67.     It appears to Plaintiff the name was likely removed by a T-Mobile back office employee—such as a database administrator or a computer programmer in the IT department—who had the authority and the ability to bypass the applications available to T-Mobile store employees and other representatives—which did not allow the name to be removed from an account—and directly alter the account information stored in electronic database.

68.     T-Mobile's response to subpoenas issued by Plaintiff in *Arora v. Transworld Systems, Inc.*, Case no. 15-cv-04941 (N.D. Ill) is also telling.

69.     Plaintiff's 3846 cell phone was, and still is, on a prepaid service plan for which he does not receive monthly statements. Consequently, on May 17, 2016, Plaintiff had served a subpoena on T-Mobile requesting various documents regarding his 3846 cell phone account. After telling Plaintiff for several weeks that they were working on the subpoena, T-Mobile came back and said it cannot find the subpoena.

70.     In the meantime, Plaintiff served a second subpoena on T-Mobile. Among other things, the subpoena requested receipts for payments made by Plaintiff to T-Mobile in 2009 and 2010. The receipts would confirm that Plaintiff's name was on the account in the beginning and then it disappeared. T-Mobile responded stating the receipts from 2009 and 2010 are no longer available. The IRS rules require businesses to preserve their financial records for at least six (6) years after filing of tax return. The subpoena was served in 2016. Assuming T-Mobile filed its 2009 return in 2010, and 2010 return in 2011, T-Mobile should have had those payment receipts when the subpoena was served.

71.     The second subpoena also requested account information of any previous subscriber named Elizabeth Adams of the 3846 cell phone number. In response, T-Mobile produced an almost unreadable one page document which appears to be a screen shot of the

account of the previous subscriber. The record appears to be a fake. The image shows that the service of the previous subscriber ended on October 9, 2009—just one (1) day before Plaintiff's subscription began. In 2009, the telephone service providers were required to age the disconnected numbers for ninety (90) days before reusing the numbers, Also, in 2009, it appears it used to take about one (1) day to transfer service from one provider to another while retaining the same number. The previous subscriber record was produced by T-Mobile's MetroPCS unit. In 2009, MetroPCS was an independent company. It appears T-Mobile created a fake record to make it look like the number was transferred from MetroPCS to T-Mobile and was not a new service.

72.    T-Mobile misconduct did not end with the removal his name from the account or creation of fake record of previous subscriber; T-Mobile continued to disseminate false caller ID information for Plaintiff's 3846 cell phone number until at least as recently as end of 2019.

73.    On August 11, 2014, Plaintiff had called a local attorney to seek help stop the calls. In that call, the attorney informed Plaintiff that the caller ID on his telephone shows the name Elizabeth Adams for his 3846 cell phone number. Later that day, Plaintiff met the attorney at his office and took a picture of the caller ID on his telephone.

74.    The Cook county records show that the very next day, on August 12, 2014, an Elizabeth G Adams agreed to settle a lawsuit brought by Capital One Bank (USA), N.A. for non-payment (Case No. 14 M1 135185). This and other evidence suggest that some of the wrong number calls to Plaintiff's 3846 cell phone were regarding this debt.

75.    Many of the collection agency callers also appeared to be tracking Plaintiff's 3846 cell phone—information they could have received only come from T-Mobile. That is because

until the year 2019, Plaintiff had a very basic cell phone which was not a smart phone. It had no third party applications of any kind which could possibly leak the usage or location information.

### COUNT 1: TCPA VIOLATION – DCI

76.   Plaintiff incorporates preceding paragraphs 1 through 75 here.

77.   The TCPA 47 U.S.C. § 227(b)(1)(A)(iii) makes it illegal to autodial calls to cell phones using an Automatic Telephone Dialing System ("ATDS") without the prior express consent of the called party. It states, in relevant parts:

> **(b) Restrictions on use of automated telephone equipment**
>
> **(1) Prohibitions**
>
> **It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States –**
>
> **(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automated telephone dialing system or an artificial or prerecorded voice ….**
>
> **(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call….**

78.   Calls by defendant DCI to Plaintiff's 3846 cell phone number were wrong number calls—DCI did not have Plaintiff's prior express consent to autodial calls to his 3846 cell phone.

79.   On several of the calls that Plaintiff had picked up, Plaintiff encountered complete silence on the line for several seconds. This phenomenon is popularly known as "dead air" and is usually associated with automatic dialers. The "dead air" occurs when a call receiver picks up the

call dialed by an automatic dialer but no live agent is available at the caller's end to receive that call.

80.     On information and belief that defendant DCI had dialed unauthorized calls to plaintiff's 3846 using an ATDS, defendant DCI violated the TCPA 47 U.S.C. §227(b)(1)(A)(iii).

81.     TCPA violations are punishable under 47 U.S.C. §227(b)(3):

> **A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that state –**
>> **(A)     an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,**
>> **(B)     an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or**
>> **(C)     both such actions.**
>
> **If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under the subparagraph (B) of this paragraph.**

82.     Plaintiff suffered actual damages including invasion of privacy, severe emotional distress, and cost of calls as a result of DCI's calls.

WHEREFORE, plaintiff respectfully seeks judgment in favor of himself, awarding:

(A)     Statutory damages of $500 for each violation of TCPA,

(B)     Actual damages that are in excess of statutory damages,

(C)     Costs of litigation and attorney's fees,

(D)     All other proper relief.

## COUNT 2: WILLFUL OR KNOWING VIOLATION OF TCPA – DCI

83.     Plaintiff incorporates preceding paragraphs 1 through 82 here.

84.     On information and belief that DCI recklessly placed autodialed calls to Plaintiff's 3846 cell phone using an ATDS without the due diligence to ensure that it had the current phone number of the debtor.

85.     On information and belief that DCI had placed autodialed calls to Plaintiff's 3846 cell phone using an ATDS knowing it did not have prior express consent to autodial calls to that number.

86.     Defendant DCI willfully and knowingly violated the TCPA.

87.     Plaintiff suffered actual damages including invasion of privacy, severe emotional distress, and cost of calls as a result of DCI's calls.

WHEREFORE, plaintiff respectfully seeks judgment in favor of himself, awarding:

(A)     Statutory damages of $1500 for each willful and knowing violation of TCPA,

(B)     Treble actual damages that are in excess of statutory damages,

(C)     Costs of litigation and attorney's fees,

(D)     All other proper relief.

## COUNT 3: INTRUSION UPON SECLUSION – DCI

88.     Plaintiff incorporates preceding paragraphs 1 through 87 here.

89.     On information and belief that DCI had knowingly placed wrong number calls to Plaintiff's 3846 cell phone number.

90.     On information and belief that a John Doe defendant had placed a debt account with DCI and instructed DCI to call Plaintiff's 3846 cell phone number.

91.     On information and belief that the purpose of the calls was to harass Plaintiff.

92.     Plaintiff suffered actual damages including invasion of privacy, severe emotional distress, and cost of calls as a result of DCI's calls.

WHEREFORE, plaintiff respectfully seeks judgment in favor of himself, awarding:

(A)     Actual damages,

(B)     Punitive damages,

(C)     Costs of litigation and attorney's fees,

(D)     All other proper relief.

## COUNT 4: TCPA VIOLATION – FMA

93.     Plaintiff incorporates preceding paragraphs 1 through 92 here.

94.     Calls by defendant FMA to Plaintiff's 3846 cell phone number were wrong number calls—FMA did not have Plaintiff's prior express consent to autodial calls to his 3846 cell phone.

95.     On information and belief that defendant FMA had dialed calls to plaintiff's 3846 using an ADAD which was also an ATDS, or using an ATDS, defendant FMA violated the TCPA 47 U.S.C. § 227(b)(1)(A)(iii).

96.     Plaintiff suffered actual damages including invasion of privacy, severe emotional distress, and cost of calls as a result of FMA's calls.

WHEREFORE, plaintiff respectfully seeks judgment in favor of himself, awarding:

(A)     Statutory damages of $500 for each TCPA violation by FMA,

(B)     Actual damages that are in excess of statutory damages,

(C)     Costs of litigation and attorney's fees,

(D)     All other proper relief.

## COUNT 5: WILLFUL OR KNOWING VIOLATION OF TCPA – FMA

97.     Plaintiff incorporates preceding paragraphs 1 through 96 here.

98.     On information and belief that FMA recklessly placed autodialed calls to Plaintiff's 3846 cell phone using an ATDS without a due diligence to ensure that it was dialing the current phone number of the debtor.

99.     On information and belief that FMA had placed autodialed calls to Plaintiff's 3846 cell phone using an ATDS knowing it did not have prior express consent to autodial calls to that number.

100.    Defendant FMA willfully and knowingly violated the TCPA.

101.    Plaintiff suffered actual damages including invasion of privacy, severe emotional distress, and cost of calls as a result of FMA's calls.

WHEREFORE, plaintiff respectfully seeks judgment in favor of himself, awarding:

(A)     Statutory damages of $1500 for each willful and knowing violation of TCPA,

(B)     Treble actual damages that are in excess of statutory damages,

(C)     Costs of litigation and attorney's fees,

(D)     All other proper relief.

## COUNT 6: INTRUSION UPON SECLUSION – FMA

102.    Plaintiff incorporates preceding paragraphs 1 through 101 here.

103.    On information and belief that FMA had knowingly placed wrong number calls to Plaintiff's 3846 cell phone number.

104.    On information and belief that a John Doe defendant had placed a debt account with FMA and instructed FMA to call Plaintiff's 3846 cell phone number.

105. On information and belief that the purpose of the calls was to harass Plaintiff.

106. Plaintiff suffered actual damages including invasion of privacy, severe emotional distress, and cost of calls as a result of FMA's calls.

WHEREFORE, plaintiff respectfully seeks judgment in favor of himself, awarding:

(A)    Actual damages,

(B)    Punitive damages,

(C)    Costs of litigation and attorney's fees,

(D)    All other proper relief.

## COUNT 7: TCPA VIOLATION – FNCB

107. Plaintiff incorporates preceding paragraphs 1 through 106 here.

108. The text message by defendant FNCB to Plaintiff's 3846 cell phone number was a wrong number call—FNCB did not have Plaintiff's permission to call or text his 3846 cell phone.

109. There are several reasons to believe that FNCB had dialed Plaintiff's 3846 cell phone number using an ATDS.

110. The text message was sent from telephone number 844-906-2663 but the message requested a call back at telephone number 800-824-6191, implying that the number 844-906-2663 is dedicated to text messaging with no live agent available at that number.

111. The text message ended with "Reply STOP to stop SMS". The response is designed to be easily understood by a machine, and such text message responses are usually processed automatically by a machine.

112. It is a generic text message. Although it is customized with the debtor name and a reference number, such text messages are easily generated by a computer program which merges

a fixed text with the recipient data from a database—similar to, for example, the mail merge function available in Microsoft Word and many other word processing programs. A text message template is created with placeholders for variable parts of the text, and a program then generates a text message for each recipient by replacing the placeholders with the corresponding information for each recipient.

113.    The economics of the collection business in this case also militate against manually typing individualized text messages and manually dialing the telephone numbers. Plaintiff has been receiving wrong number calls for ELIZABETH ADAMS for over ten (10) years. FNCB is likely attempting to collect on a very old debt that others have failed to collect. Spending time and money on collecting such debt through manual dialing or texting does not make economic sense.

114.    On information and belief that—because FNCB millions of accounts in its database—FNCB utilizes a dialer that generates numbers to be dialed using a random  or sequential number generator, compares the generated numbers with the telephone numbers in its customer database, and then dials only those numbers that also exist in its customer database.

This is similar to the dialer envisioned by the court in *Pinkus v. Sirius XM Radio, Inc., 319 F.Supp.3d 927, 939 (N.D. Ill., 2018)* ("it is possible to imagine a device that both has the capacity to generate numbers randomly or sequentially and can be programmed to avoid dialing certain numbers, including numbers that belong to customers who have not consented to receive calls from a particular marketer")

115.    On information and belief that defendant FNCB had dialed calls to plaintiff's 3846 cell phone using an ATDS, FNCB violated the TCPA 47 U.S.C. § 227(b)(1)(A)(iii).

20

116.    Plaintiff suffered actual damages including invasion of privacy, severe emotional distress, and cost of calls as a result of FNCB's calls.

WHEREFORE, plaintiff respectfully seeks judgment in favor of himself, awarding:

(A)    Statutory damages of $500 for each TCPA violation by FNCB,

(B)    Actual damages that are in excess of statutory damages,

(C)    Costs of litigation and attorney's fees,

(D)    All other proper relief.

### COUNT 8: WILLFUL OR KNOWING VIOLATION OF TCPA – FNCB

117.    Plaintiff incorporates preceding paragraphs 1 through 116 here.

118.    On information and belief that FNCB recklessly placed autodialed calls to Plaintiff's 3846 cell phone using an ATDS without a due diligence to ensure that it was dialing the current phone number of the debtor.

119.    On information and belief that FNCB had placed autodialed calls to Plaintiff's 3846 cell phone using an ATDS knowing it did not have prior express consent to autodial calls to that number.

120.    Defendant FNCB willfully and knowingly violated the TCPA.

121.    Plaintiff suffered actual damages including invasion of privacy, severe emotional distress, and cost of calls as a result of FNCB's calls.

WHEREFORE, plaintiff respectfully seeks judgment in favor of himself, awarding:

(A)    Statutory damages of $1500 for each willful and knowing violation of TCPA,

(B)    Treble actual damages that are in excess of statutory damages,

(C)    Costs of litigation and attorney's fees,

(D)    All other proper relief.

## COUNT 9: INTRUSION UPON SECLUSION – FNCB

122.    Plaintiff incorporates preceding paragraphs 1 through 121 here.

123.    On information and belief that FNCB had knowingly placed wrong number call to Plaintiff's 3846 cell phone number.

124.    On information and belief that a John Doe defendant had placed a debt account with FNCB and instructed FNCB to call Plaintiff's 3846 cell phone number.

125.    On information and belief that the purpose of the call/text message was to harass Plaintiff.

126.    Plaintiff suffered actual damages including invasion of privacy, severe emotional distress, and cost of calls as a result of FNCB's calls.

WHEREFORE, plaintiff respectfully seeks judgment in favor of himself, awarding:

(A)    Actual damages,

(B)    Punitive damages,

(C)    Costs of litigation and attorney's fees,

(D)    All other proper relief.

## COUNT 10: FDCPA VIOLATION– FNCB

127.    Plaintiff incorporates preceding paragraphs 1 through 126 here.

128.    On information and belief that FNCB knowingly sent the wrong number text message to his 3846 cell phone in order to perpetuate the harassment of the past ten (10) years, the text message by FNCB violated FDCPA 15 U.S.C. § 1692d.

129.    On information and belief FNCB knowingly sent the wrong number text to further the fraudulent scheme to implicate Plaintiff as the actual debtor, call by FNCB violated 15 U.S.C. 1692e.

130.    On information and belief that FNCB knowingly sent the wrong number text message to his 3846 cell phone because it was asked to it and paid to id,  the text message by FNCB violated FDCPA 15 U.S.C. § 1692f.

131.    Plaintiff suffered actual damages including invasion of privacy, severe emotional distress, and cost of call as a result of FNCB text message.

WHEREFORE, plaintiff respectfully seeks judgment in favor of himself, awarding:

(A)    Statutory damages of $1000,

(B)    Actual damages,

(C)    Costs of litigation and attorney's fees,

(D)    All other proper relief.

## COUNT 11: CIVIL CONSPIRACY

132.    Plaintiff incorporates preceding paragraphs 1 through 131 here.

133.    On information and belief T-Mobile or its employees, debtors named Elizabeth Adams or Elizabeth G Adams or John Doe defendants directing the actions of these debtors, and John Doe defendants conspired to incur debts, default on debts, and direct collection agency calls to Plaintiff's 3846 cell phone in order to harass Plaintiff or otherwise abuse him, including framing him for the debts. Some of the collection agencies or their employees also appear to be part of the conspiracy as they have produced fabricated records during discovery.

134.    On information and belief that T-Mobile or its employees deliberately removed Plaintiff's name from his 3846 cell phone account.

135.    On information and belief that T-Mobile or its employees created a fake subscription account in the name of Elizabeth Adams for the period immediately preceding the date Plaintiff's subscription began to make it appear that Plaintiff's subscription was simply a transfer from one service provider to another and continuation of the same service.

136.    On information and belief that T-Mobile or its employees falsified caller ID information associated with Plaintiff's 3846 cell phone number and disseminated the false caller ID information to third parties.

137.    On information and belief that T-Mobile or its employees unlawfully relayed tracking information regarding Plaintiff's 3846 cell phone in realtime or near realtime to third parties, including collection agencies, over the past ten (10) years.

138.    On information and belief that T-Mobile or its employees unlawfully provided Plaintiff's 3846 cell phone usage information to third parties, including collection agencies, over the past ten (10) years.

139.    On information and belief that T-Mobile or its employees carried out these actions in furtherance of the conspiracy.

140.    Plaintiff has suffered tremendous actual damages, including emotional distress, as result of actions of T-Mobile or its employees and its co-conspirators in the form of persistent intrusive calls from collection agencies over the past ten (10) years.

141.    On information  and belief that one or more of the conspirators then moved those accounts from agency to agency to perpetuate the scheme and kept it going for the past ten (10) years.

142. Plaintiff estimates his recurring yearly losses at $100,000 per year over the past five years due to distraction from work and damage to business relationships as result of the persistent and frequent wrong number calls and intimidation.

143. Plaintiff has also suffered a loss American dream and estimated loss of future income of $100 million due to constant distraction from calls and intimidation making it impossible for him to focus on a product development.

WHEREFORE, plaintiff respectfully seeks judgment in favor of himself, awarding:

(A)      Actual damages,

(B)      Punitive damages,

(C)      Costs of litigation and attorney's fees.

(D)      All other proper relief.

## COUNT 12: ILLINOIS HATE CRIME

144. Plaintiff incorporates preceding paragraphs 1 through 143 here.

145. On information and belief that the a fake subscriber record for Elizabeth Adams was created by T-Mobile or its employees in order to direct collection agency calls to Plaintiff' 3846 cell phone number in order to harass or otherwise abuse Plaintiff including framing Plaintiff for the debts.

146. On information and belief that subscription start date of September 11 was purposefully inserted in the record indicates the motivation for the actions which was hate.

147. On information and belief that these actions were directed at Plaintiff based on his perceived religion.

148. Actions of Defendants violated 720 ILCS 5/12-7.1 which states, in relevant parts:

**A person commits hate crime when, by reason of the actual or perceived race, color, creed, religion, ancestry, gender, sexual orientation, physical or mental disability, or national origin of another individual or group of individuals, regardless of the existence of any other motivating factor or factors, he or she commits assault, battery, aggravated assault, intimidation, stalking, cyberstalking, misdemeanor theft, criminal trespass to residence, misdemeanor criminal damage to property, criminal trespass to vehicle, criminal trespass to real property, mob action, disorderly conduct, transmission of obscene messages, harassment by telephone, or harassment through electronic communications as these crimes are defined in Sections 12-1, 12-2, 12-3(a), 12-7.3, 12-7.5, 16-1, 19-4, 21-1, 21-2, 21-3, 25-1, 26-1, 26.5-1, 26.5-2, paragraphs (a)(1), (a)(2), and (a)(3) of Section 12-6, and paragraphs (a)(2) and (a)(5) of Section 26.5-3 of this Code, respectively.**

149.    Section 720 ILCS 5/26-5.2 defines harassment by telephone as:

**(a) A person commits harassment by telephone when he or she uses telephone communication for any of the following purposes:**

**…**

**(2) Making a telephone call, whether or not conversation ensues, with intent to abuse, threaten or harass any person at the called number;**

**(3) Making or causing the telephone of another repeatedly to ring, with intent to harass any person at the called number;**

**(4) Making repeated telephone calls, during which conversation ensues, solely to harass any person at the called number;**

**…**

WHEREFORE, plaintiff respectfully seeks judgment in favor of himself, awarding:

(A)    Actual damages,

(B)    Penalty of $25,000 for each violation of the act,

(C)    Costs of litigation and attorney's fees.

26

(D)      All other proper relief.

Dated: February 1, 2021.

Respectfully Submitted,

/s/ Ashok Arora_____
Ashok Arora, Pro Se
869 E Schaumburg Rd 217
Schaumburg, IL 60194
Tel: 224-622-3846

## CERTIFICATE OF SERVICE

I, Ashok Arora, hereby certify that on February 1, 2021, I filed the foregoing FIRST

AMENDED COMPAINT with the Clerk of the Court using the CM/ECF system which will send

the notification of such filing to all attorneys of record.

/s/ Ashok Arora_____
Ashok Arora
*Pro Se Plaintiff*

# Exhibit 1

**Diversified Consultants, Inc.'s (DCI)**

**Automatic Dial Announcing Device (ADAD) Registration**

**with Public Utility Commission of Texas (PUC)**

# Exhibit 1 – DCI's ADAD Registration with PUC

ADAD Report                                     http://www.puc.texas.gov/industry/communications/directories/adad/repo...



**Public Utility Commission of Texas**

ADAD Report

## DIVERSIFIED CONSULTANTS INC

Permit No: 070122

**Type:** ADAD

**Permit Approved Date:** 3/28/2007

**Date Last Renewed:** 3/28/2018

**DBA Names**

No DBA Records

**Contact Information**

Company / Physical   (Mailing Address)
DIVERSIFIED CONSULTANTS INC
MAVIS PYE
VP OF COMPLIANCE
10550 DEERWOOD PARK BLVD
SUITE 309
JACKSONVILLE,FL 32256
**Web:** www.dcicollect.com
**Email:** info@dcicollect.com
**Phone:** 904-247-5500
**Toll Free:** 800-771-5361
**Fax:** 904-247-0660

ADAD Physical Address
DIVERSIFIED CONSULTANTS INC
MAVIS PYE
10550 DEERWOOD PARK BLVD
SUITE 309
JACKSONVILLE,FL 32256
**Email:** mavis@dcicollect.com
**Phone:** 904-694-3141
**Toll Free:** 800-771-5361
**Fax:** 904-247-0660

ADAD Physical Address
DIVERSIFIED CONSULTANTS INC
MAVIS PYE
10550 DEERWOOD PARK BLVD
SUITE 309
JACKSONVILLE,FL 32256
**Email:** mavis@dcicollect.com
**Phone:** 904-694-3141
**Toll Free:** 800-771-5361
**Fax:** 904-247-0660

**Reports**

2018
**ADAD Annual Report**
**Submitted:** 1/12/2018
**Waiting For Approval:** 1/12/2018

2017
**ADAD Annual Report**
**Submitted:** 1/19/2017
**Approved:** 12/5/2017

2015
**ADAD Annual Report**
**Submitted:** 11/3/2015
**Approved:** 11/18/2015

2014
**ADAD Annual Report**
**Submitted:** 3/3/2014
**Approved:** 11/25/2014

2013
**ADAD Annual Report**
**Submitted:** 4/11/2013
**Approved:** 4/16/2013

2012
**ADAD Annual Report**
**Submitted:** 11/26/2012
**Approved:** 3/19/2013

2011
**ADAD Annual Report**
**Submitted:** 11/1/2011
**Approved:** 12/12/2011

2010
**ADAD Annual Report**
**Submitted:** 11/10/2010
**Approved:** 11/18/2010

2009
**ADAD Annual Report**
**Submitted:** 11/9/2009
**Approved:** 11/18/2009

2008
**ADAD Annual Report**
**Submitted:** 1/15/2008
**Approved:** 11/6/2008

End Report

# Exhibit 2

**Public Utility Commission of Texas (PUC)**

**Instructions for Automatic Dial Announcing Device (ADAD)**

**Permit**

Exhibit 2 – PUC Instructions for ADAD Permit



Pursuant to PUC SUBSTANTIVE RULE § 26.125

# *Instructions* for Application for a Texas Permit to Operate an Automatic Dial Announcing Device (ADAD)

**General Instructions**

**Permit Required**

A person may not use an ADAD to make a telephone call in which the device plays a recorded message when the connection is completed unless the person has a permit.  A permit is required for an ADAD that is used to make a telephone call that originates or terminates in the state of Texas.

**Definitions**

★ *ADAD* – any automated equipment used for telephone solicitation or collection that (1) is capable of storing telephone numbers to be called or has a random or sequential number generator capable of producing numbers to be called and (2) alone or in conjunction with other equipment, can convey a prerecorded or synthesized voice message to the number called without the use of a live operator.

★ *Telephone Solicitation* – to make an unsolicited call.

**New Permit procedures**

New ADAD permit seekers are required to submit the Texas Permit to Operate an Automatic Dial Announcing Device (ADAD) application.  New ADAD permit seekers must submit a $50 fee (a check made out to the Public Utility Commission of Texas) with each new ADAD permit application.  An ADAD permit is valid for one year after its date of issuance.  New ADAD permit requests shall be made by completing the form approved by the Commission, which shall be verified by oath or affirmation of the registering party.  Permit application forms may be obtained from the Central Records division of the Public Utility Commission of Texas or downloaded from the Commission website at www.puc.texas.gov.  Subject to the Commission's Procedural Rules, the completed permit form should be filed with

Public Utility Commission of Texas
Attention: Central Records
1701 N. Congress Avenue
P.O. Box 13326
Austin, Texas 78711-3326

Submit the original and 3 copies of the form (not the instructions).

**Renewal Permit procedures**

**A permit approved by the PUC is valid for one year after its date of issuance.**  In order to continue registration, a permit holder must submit an ADAD permit renewal form along with a $15 renewal fee which must be filed at least 90 days prior to the expiration date of the current ADAD permit.  Failure to timely file an ADAD renewal form will render the renewal application invalid.  If a permit is still desired after the renewal expiration date, the ADAD permit holder will have to submit a new ADAD permit application along with the $50 permit fee instead of the $15 renewal fee.  Renewal permit requests shall be made by using the ADAD renewal application that can be found on the Commission website at https://www.puc.texas.gov/portal/PortalHelp.aspx.

# Exhibit 3

**FMA Alliance Ltd's (FMA)**

**Automatic Dial Announcing Device (ADAD) Registration**

**with Public Utility Commission of Texas (PUC)**

# Exhibit 3 – FMA's ADAD Registration with PUC

ADAD Report                                                    http://www.puc.texas.gov/industry/communications/directories/adad/repo...



**Public Utility Commission of Texas**

ADAD Report

**FMA ALLIANCE LTD**

Permit No: 980222

Type: ADAD
Permit Approved Date: 11/10/1998
Date Last Renewed: 11/10/2018

**DBA Names**

FMA ALLIANCE, LTD                              MED+COMM

REVENUE CYCLE PROFESSIONALS

**Contact Information**

| Mailing / PO Box  (Mailing Address) | ADAD Physical Address |
|---|---|
| FMA ALLIANCE LTD | FMA ALLIANCE LTD |
| MICHAEL JANAKES | 11811 NORTH FRWY |
| P O BOX 2409 | SUITE 900 |
| HOUSTON, TX 77252-2409 | HOUSTON, TX 77060 |
| **Web:** www.fmaalliance.com | **Phone:** 281-931-5050 |
| **Email:** mjanakes@fmaalliance.com | **Fax:** 281-670-1532 |
| **Phone:** 281-931-5050 | |
| **Toll Free:** 800-955-5598 | |
| **Fax:** 281-670-1532 | |

| ADAD Physical Address | Company / Physical |
|---|---|
| FMA ALLIANCE LTD | FMA ALLIANCE LTD |
| MICHAEL JANAKES | MICHAEL JANAKES |
| 12339 CUTTEN ROAD | 12339 CUTTEN ROAD |
| HOUSTON, TX 77066 | HOUSTON, TX 77066 |
| **Web:** www.fmaalliance.com | **Web:** www.fmaalliance.com |
| **Phone:** 281-931-5050 | **Email:** mjanakes@fmaalliance.com |
| **Toll Free:** 800-955-5598 | **Phone:** 281-931-5050 |
| **Fax:** 281-670-1600 | **Toll Free:** 800-955-5598 |
| | **Fax:** 281-670-1532 |

**Reports**

| 2018 | 2017 |
|---|---|
| **ADAD Annual Report** | **ADAD Annual Report** |
| **Submitted:** 8/2/2018 | **Submitted:** 8/3/2017 |
| **Approved:** 8/6/2018 | **Approved:** 8/9/2017 |

| 2016 | 2015 |
|---|---|
| **ADAD Annual Report** | **ADAD Annual Report** |
| **Submitted:** 8/11/2016 | **Submitted:** 8/5/2015 |
| **Approved:** 8/15/2016 | **Approved:** 8/12/2015 |

| 2014 | 2013 |
|---|---|
| **ADAD Annual Report** | **ADAD Annual Report** |
| **Submitted:** 8/13/2014 | **Submitted:** 6/14/2013 |
| **Approved:** 8/18/2014 | **Approved:** 7/1/2013 |

| 2012 | 2011 |
|---|---|
| **ADAD Annual Report** | **ADAD Annual Report** |
| **Submitted:** 7/10/2012 | **Submitted:** 6/27/2011 |
| **Approved:** 7/13/2012 | **Approved:** 8/12/2011 |

| 2010 | 2009 |
|---|---|
| **ADAD Annual Report** | **ADAD Annual Report** |
| **Submitted:** 6/24/2010 | **Submitted:** 7/7/2009 |
| **Approved:** 7/9/2010 | **Approved:** 8/27/2009 |

| 2008 | 2007 |
|---|---|
| **ADAD Annual Report** | **ADAD Annual Report** |
| **Submitted:** 7/3/2008 | **Submitted:** 7/6/2007 |
| **Approved:** 7/10/2008 | **Approved:** 7/10/2007 |

| 2006 | |
|---|---|
| **ADAD Annual Report** | |
| **Submitted:** 8/10/2006 | |
| **Approved:** 11/27/2006 | |

End Report